So, forgive me if I mispronounce your name, Ms. Cancian, close, all right, welcome, take it away. Thank you, Your Honors. It's very good to be here this morning. My name is Phyllis Cancian, and I represent the appellant People Source Staffing Professionals. At the outset, I wanted to respond, if I may, to the supplemental letter brief submitted by the Council for the Defendants. And in particular, their assertion that People Source did not identify any competent evidence of a financial loss or harm resulting from or caused by what they describe as bad acts under the Unfair Trade Practices Act. To the contrary, not only did People Source allege in their original and amended complaint that they had sustained financial loss caused by the solicitation of both their employees and their customers, but they also admitted summary judgment evidence in the form of declarations where the defendants actually bragged Ms. Anna Robertson and Shawna Bradley about the customers of the appellant, of People Source. And so, suffice it to say that not only did People Source plead ascertainable damages in its complaint, in addition to certain unascertainable damages, such as damage to its business reputation, but it introduced competent evidence in the form of admissions by a party opponent that they actually caused the loss of a customer of Petrin Corporation. And so, this is not a case where a business is trying to prevent low-level employees from earning a living and competing with a company after those employees have left their employment. Instead, this is a case where the highest management employee in People Source's Louisiana operations, which were in Monroe and Ruston, Louisiana, the regional vice president, that was Ms. Anna Robertson, she engaged in a campaign with the account manager. Account managers have relationships with customers. The two of them engaged in this campaign to solicit the entirety of the company's Louisiana workforce and their customers while they were still employed by my client and earning very handsome salaries. The district court, in its ruling, granting defendants motions for summary judgment, shockingly concluded, quote, there were no legal impediments to the defendants' actions. Respectfully, the district court's ruling is contrary to Louisiana law. I'm going to focus on three errors today in my argument. First, the district court erred in not drawing all inferences in favor of People Source as the non-movement, and they disregarded People Source's undisputed evidence that two of the while they were still employed by People Source, which has been held to be an unfair trade practice and a breach of fiduciary duty under Louisiana law. The district court also improperly excluded two key pieces of evidence offered by People Source in opposition to defendants' motion for summary judgment. They are critical to People Source's claim that the other defendants, Will Source, Kathy Williamson in particular, engaged in a conspiracy with Anna Richardson, which is Kathy Williamson's daughter and Wayne Williamson's stepdaughter, and Shawna Bradley to violate the Unfair Trade Practices Act. Also, the district court improperly dismissed People Source's claims against Ms. Robertson and Ms. Bradley because it incorrectly held as a matter of law that a fiduciary duty does not exist under Louisiana law unless an employee is an agent or a mandatory of his employer, which is contrary to the case law. The district court premised its holding primarily on the case of Innovative Manpower Solutions v. Ironman Staffing, and other than the fact that both cases involve staffing companies, the case is not applicable here for the reasons that that case was decided on a request for preliminary injunctive relief, which is a completely different situation and standard than a motion for summary judgment. As your honors know, a preliminary injunction is an extraordinary remedy. Its drastic relief and its granting such relief is treated as the exception rather than the rule. People Source lost its request for injunctive relief, as you may know, because, in fact, the CEO testified at the injunction hearing that he had been damaged to the tune of $300,000 even in the first couple of months. The lawsuit was filed in April, the injunctive hearing was held in June or July, and the company had lost $300,000. At that point, it was a little bit of a gotcha moment. The defendant stood up and said, aha, you know, you've been damaged. You can't get injunctive relief, and the court granted that. That's a very drastic relief. The plaintiff seeking injunctive relief bears a heavy burden. Second, unlike the non-movement in opposition to a motion for summary judgment, where all facts and allegations are viewed in the light most favorable to the non-movement. That didn't happen here. Second, innovative is distinguishable on the facts. Innovative did not involve solicitation of customers while the employee was still employed by the company. That is the cornerstone of why the court's judgment was erroneous. Indeed, the court in innovative specifically found that, quote, the testimony establishes that Marcel, who was the accused former employee in that case, did not solicit innovative's customers until after he resigned from the company. If someone solicits customers during the term of their employment, and the cases make this very clear, whether they are outside salespeople, whether they are physical therapists in one of the cases, that is an unfair trade practice. It is unethical and it is immoral. A company is paying employees to be loyal and faithful. How can a company where the CEO or the president resides in another state and appoints a regional vice president or a president of local operations to manage their business in Louisiana? They're not on site. They don't have eyes everywhere.  The employees who are officers of this local institution owe a duty of loyalty and fidelity to their employer, not to be acting contrary to the employer's interest while the employer is paying them, and has put them in such a role as to have access to all of their confidential trade secret information and their client relationships. Resolving all doubt in favor of PeopleSource, PeopleSource has demonstrated at the very least that material issues remain as to their claims under the Louisiana Unfair Trade Practices Act that should warrant a reversal of the district court's ruling. The district court erred in striking two pieces of critical evidence. First, I will address the court's improper exclusion of the service agreement. It's dated March the 13th, 2019, and it was executed by WillSource, Kathy Williamson, the owner of WillSource, and Petrin Corporation, who is a former PeopleSource customer. The time was a PeopleSource customer and unbeknownst had been solicited. And then I will address the court's exclusion of Emmett Reeves' declaration and a check drawn on WillSource's account that was attached to Mr. Reeves' declaration. And very importantly, both of those pieces of evidence, the service agreement and the WillSource check, were the subject of discovery requests that PeopleSource directed to the judge, Ms. Bradley, because she was not working at the time for WillSource. They failed to produce it. This was a WillSource check, an agreement, a customer agreement that WillSource had entered into. They failed to produce it and yet claimed prejudice because we got it from another source, we subpoenaed it, and yet the court excluded it. So Petrin was—I'll first talk about the Petrin agreement. The agreement was executed by Kathy Williamson and entered into two days before the mass resignation of all of the PeopleSource employees. We did not offer it up under—we produced it and attached it to a declaration signed by a PeopleSource employee. We did not avert in that declaration—she did not avert that she had personal knowledge of that. She in fact said that PeopleSource had gotten the document from Petrin Corporation through a subpoena, and she attached the subpoena to her declaration. PeopleSource relied not on Ms. Keepover to authenticate it. Instead, it relied on 901B4 of the Federal Rules of Evidence. 901A states that the authentication standard for the admissibility of a document can be satisfied by evidence sufficient to support a finding that the matter in question is what it purports to be. Rule 901B4 provides a specific example of how this standard can be satisfied, and that's by examining the appearance, the contents, the substance, the internal patterns, or other distinctive characteristics taken with all the circumstances. There are a number of reasons why this agreement should have been admitted under 901B4. First of all, it was produced by Petrin Corporation, and not us, not somebody else. It was produced by a company pursuant to a subpoena. It contains WillSource's logo on the very first page. There's a notation on the bottom left corner that it was amended in March of 2019, which is the very month that it was signed, so it certainly makes sense that it might have been pulled up and amended on the month that it was signed. It shows it was executed on March 13, 2019, two days before the mass resignation of all the PeopleSource employees. The signature of Kathy Williamson matches exactly her signature on the affidavit she submitted in support of her motion for summary judgment. A layperson can look at those signatures and see they are almost, I mean, they look identical. Perhaps most importantly, though, the undisputed testimony in the record establishes that Shawna Bradley admitted that she was involved in successfully diverting Petrin as a PeopleSource customer to a WillSource customer prior to her resignation on March 15. It fits. The circumstances all show that this document is what it purports to be, and that it is an agreement signed by WillSource diverting that company as a customer of PeopleSource to WillSource. What did the district court say about all of that? I'm sorry, Your Honor? What did the district court say about all of these statements that you are making now? The district court simply said that Courtney Keefover, the employee of PeopleSource, could not authenticate it because she did not have personal knowledge of it in her declaration. And we argued the exact same things I'm arguing now, that 901b-4 allowed it to be admitted, the circumstances, and the court denied our motion, granted the motion to strike. Counsel, can I? Yes. I realize we usually start with jurisdiction, but I wanted to make sure you got out your brief this morning on the merits, but I do have a jurisdictional question for you. I'm looking at your statement of jurisdiction in your blue brief, and it says that the district court had jurisdiction under 28 United States Code, Section 1331, because this was a civil action arising under the Constitution laws or treaties of the United States. Is there a federal claim anywhere in this case? No, Your Honor. We actually amended the complaint to establish diversity. Great, so 1332. Yes. And the plaintiff in this case is an LLC? Yes. And we actually, we did have to go back and drill down and make sure that there was complete diversity. Yes, I'm looking at what I think is the operative complaint, and it says PeopleSource is a limited liability company organized and existing under the laws of Oklahoma with its principal place of business in Oklahoma City, Oklahoma. Our precedent requires, for an LLC, not the principal place of business because it's obviously not a corporation, it's a limited liability company, so you have to allege the membership of the LLC. Is there record evidence about the members of PeopleSource? Yes. There are. In the amended complaint, there was, all of that was cured in the amended complaint. Is the amended complaint the same as the second amended complaint? Yes. Because I'm looking at it and I don't see it. It may be the first amended complaint. I believe it, Your Honor, I'm actually not positive if it was the first or the second amended complaint, but the LLC members were only the, if I recall, there was just one or two LLC members. Or maybe on rebuttal, if you have it handy, it would be helpful. I'm sorry? Maybe on rebuttal, if you have it handy. Yes. I will look it up at the end of record. Yes. But I know that that was specifically addressed by the court and they asked that PeopleSource amend its complaint to state the resident, the domicile of each of the LLC members, and they did that. And I believe the court was satisfied that jurisdiction existed. Thank you. Thank you. All right. We'll see you back on rebuttal. On the Appalachee side, I think y'all are going to divide some time, so Mr. King, you have 15 minutes. We'll hear from you at 15, and Mr. Myers for 5. May I begin? May I please the court, Brady King on behalf of Wayne Williamson, Kathy Williamson, Anna Robertson and WillSource. I want to make the record pretty clear. We briefed it in great detail. Wayne Williamson had been in the temporary staffing business for five decades.         I'm sorry. I'm sorry. I'm sorry. I'm sorry. I'm sorry. I'm sorry. I'm sorry. And they resisted at least two decades. So they were well versed in this business. They also had previously done business with every one of the customers that you just heard Peoples Force Council identify, Petran, Graphic Packaging. They knew who they were, and Graphic Packaging and Petran knew who they were. None of these three defendants were under a noncompetent. They had absolute right to compete against Peoples Force, particularly Kathy Williamson and Wayne Williamson. Will Source was organized under Delaware law that allowed to do business in Louisiana. It was a temporary staffing agency. It had no legal impediment against operating as a staffing agency or competing against Peoples Force. It was under no non-competing. The only constraints to Will Staff's ability to compete against Peoples Force would be under the Louisiana Fair Trade Practices Act. No contractual impediment. I think that's important to keep in mind because you have Will Source out here that within the bounds of the Louisiana Fair Trade Practice Act can clearly, openly compete against Peoples Force. I'm going to get to the Unfair Trade Practice Act argument, but I want to clear up, I think, two very easy points. The first is one of the theories of recovery that is being appealed is the Trade Secret Act. Now, when this, I think it's 80, at one point it's 50 pages to 80 pages of pleadings, most of it dealt with the allegations that these defendants got into their, to Peoples Source's servers, went through their files, got all these business records, got all these client lists, got all of these customer lists. That was sort of the thrust of the claim. But on appeal, if you notice, on appeal, Peoples Force on this very important claim, as originally pled, has relied upon one document to support its trade secret claim, and that is a Petrie candidate list. One document. They allege we just rifled through their documents to access their servers, but on appeal, they cite to this court one document that they say Will Source used to its, to Peoples Source's detriment, and it's a Petrie candidate list. What do they say about that? They say, well, Anna, in February of 2019, emailed, while she was still employed to Peoples Source, emailed the candidate list to other Peoples Source employees, and that's it. That's all the evidence they have. There was no evidence on motion for summary judgment that the candidate list that was properly circulated amongst the then Peoples Source employees ended up in the hands of Will Source, or more importantly, Will Source ever used that to compete against Peoples Source. The district court correctly concluded or spotted that glaring deficiency and said, okay, I got a candidate list, but you don't have evidence that it was disseminated or retrieved or used by Will Source to compete against you. There is no material issue created by this candidate list. We're going to, I'm going to dismiss the trade secret act, and I respectfully submit, when you look at the evidence before you in the briefs, you'll conclude, even on a de novo review, that claim needs to be, that dismissal of that claim needs to be affirmed. The other theory of recovery or cause of action that has been appealed is the breach of fiduciary claim that's only against Anna Robertson, and to remind the court, she was an at-will employee, never signed an employment contract, never signed a handbook, never signed a non-compete, never signed an NDA. She was clearly not a corporate officer. Mr. Bozales, the principal, said she could be terminated at will. She clearly was not an agent or a mandatory. She simply managed the sales personnel. The district court relied heavily upon innovative manpower, but when you read innovative manpower, Western District decision, which we have cited, it relies heavily upon a Louisiana Supreme Court, Schaffer versus Adams and Reese, to determine when a fiduciary duty exists. Louisiana law is clear. Fiduciary duties exist only if you're a fiduciary. Generally, employees do not have or are not fiduciaries because they are not mandatories or agents. It's only when an employee is a mandatory or an agent that the fiduciary duty is imposed upon that person. So, as a matter of law, given the facts that are before this court, Anna Robertson cannot be considered a fiduciary, therefore, she cannot owe a fiduciary duty to People Source. That claim needs to be dismissed. I'm not suggesting to this court she had no duty at all. She just didn't have a fiduciary duty, and innovative manpower described . . . Is there a difference between a mandatory duty and a duty as an employee? One is the highest duty of good faith dealing with your employer, and the other that is ascribed to or burdened upon an employee is just loyalty and fealty. It's a lesser duty, but fiduciary duty is a very high duty. She clearly was not a fiduciary, and that duty should not be imposed upon her. I'm led to believe that a fiduciary duty with respect to employees is a duty of fidelity, and that the duty of fidelity is used interchangeably with the duty of fiduciary duty whenever they are discussing the duty of an employee to his employer. I would ask the court to look at Shaffer v. Adamson-Reese. They make that distinction crystal clear, and they discuss that. The Louisiana Supreme Court discusses that very, very real difference in that decision. I think that's what innovated a lot upon a Louisiana Supreme Court case in terms of dealing with fiduciary duties. I want to get into the left of the Unfair Trade Practices Act now. Just keep in mind, on the motion for summary judgment, yes, we had the burden of proof, but they had the burden of proof at time of trial, so all we had to do was establish the absence of facts or evidence which would allow them to succeed at time of trial. That's it. Then it shifted over to people's courts to say, oh, no, we've got a material issue. They ended up, because they had the burden of proof as the plaintiff, they had the burden of proof as the plaintiff, they were going to have to come forward with the evidence, not Willsors. What evidence did they come forward with? They never took the opportunity to depose Anna Robertson. They never took the opportunity to depose Mr. Wayne Williamson or Kathy Williamson. They complained about how Petrin treated them. They never deposed a representative from Petrin. They never deposed a representative from Graphic Packaging. They never deposed any of the other representatives of the businesses at issue. Don't know why, but we don't have, for this record, the benefit of what those representatives might have said. So when their Trade Secrets Act claim sort of withered away, they pivoted and they said, we've got unfair trade practices because you have lured away employees, you've lured away customers, and you've lured away temporary employees. And I want to be sure you all understand, in the temporary staffing agency world, you have, I guess, permanent employees, clerical that work in the office, then that staffing agency has a number of temporary employees that they then lend or rent out, so to speak, to their customers. So luring away of employees, I wanted to draw the court's attention to the actual verbiage of innovative manpower. It's cited always for the proposition that there's a fine definitive line between not being hired or not being an employee and what you can do after that. And that's what we heard today, that an employee, while still hired, can't do anything to set up a new shop, can do nothing to set up a new business. What I think is missed is that the defendant in innovative manpower actually gave the notice on June the 29th, but made it effective July the 1st, so it was a three-day lapse. Guess what the defendant did in innovative resource, in innovative manpower, while he was still, quote-unquote, employed, he contacted employees, and it's listed the litany of all the employees, two days before his resignation became effective, he contacted 30 or 40 employees to get them to come to his new business. So there's not a bright line about when you can start having preparatory actions when you plan to go out on your own. Judge Hike looked at all that, and he said, I don't find the actions of the defendant in this three-day time period between the time he tendered his resignation and the time it became effective that he violated the Louisiana Unfair Trade Practice by starting to contact his co-employees to see if they wanted to come with him. That's very important when you look at the case. The second item, or part of their Unfair Trade Practices Act, deals with luring away employees temporary employees. Now, they don't tell you that PeopleSource's principle absolutely agreed that they're not exclusive to PeopleSource, they're not their property. These temporary employees work for other agencies, and it's not unusual for them to work for multiple agencies. Both Mr. Bozales and Courtney Keefover both testified they were unaware during the Preliminary Injunction hearing, which is their only sworn testimony, live testimony, they were unaware of any temporary employee that left PeopleSource and went to work exclusively with WillSource. The third claim of this Unfair Trade Practices Act claim is luring away customers, and again, customers are just like temporary employees. Customers use multiple employment agencies. They go back and forth, they use them simultaneously at times. All of the employment agencies knew of the existence of the identity of the customers in this little part of the world, Northeast Louisiana, and like I said, Kathy Williamson, Wayne Williamson, Anna Robertson had all worked with these same employers for the last 40 years, well known to them. Anna Robertson did meet with some of those employers, just as the defendant in Innovative Manpower did, to let them know, hey, I am leaving, I am leaving. Now, I don't want to mislead the court. It will look that some affidavits submitted by Mr. Scott Albritton and Kathy Keefover, and they're going to say in these statements, well, Anna would tell me before she left that WillSource was undertaken to get some of these businesses signed up. I read that affidavit to be just a report to her co-employees what WillSource was doing, not that she participated in it. So, I would ask the court to bear in mind when you look at that affidavit to see if it actually identifies an issue of fact. And again, Innovative Manpower, clearly the defendant in that case, clearly, clearly, clearly contacted as a preparatory act his employer's customers before he left. Real quick, they have a conspiracy claim out there that the court agrees with me and there's not ample evidence to overturn the motion for summary judgment on all these other claims of breach of fiduciary duty, etc. Then the conspiracy claim obviously falls. I would disagree about the argument made about damages. Yes, Mr. Bazzalos testified, I've calculated these damages, but all he did was say, here's my gross receipts for the whatever six weeks after the resignation of Anna and the organization and operation of WillSource. That doesn't prove a causal connection. He could have had a loss of revenue because another temporary agency came in. He could have had a loss of profit because WillSource was fairly competing against him. He's got to show that he had a loss of income because of some act that violates either the Trade Secrets Act or the Unfair Trade Practices Act that caused a customer or a client to leave. And as I said, there were no such depositions to say WillSource solicited me or Anna solicited me and I left. It's just not fair. It's not fair. What about the statement that he alleged, I believe it was Williams, allegedly made that they had destroyed PeopleSource so they could buy it at a good price? It's there. I can't deny it. But also in PeopleSource's affidavits, they also say Wayne Bragdon put $1.2 million in WillSource. Contradictory statements. You don't put $1.2 million to get WillSource up and going and then Bragdon, you're going to go buy a competitor for nothing. Can I just get two more minutes? About 30 seconds. All right. On Emmett Reeves, all I've asked the court to do, because I think I've been a little sort of thrown under the bus on this, they say we should have, PeopleSource should have identified the Emmett Reeves, I guess, paycheck and identified him as a person that we were doing business with. All I would ask the court to do is look at the request for production that is cited in their brief. I didn't understand it. I didn't know exactly what they meant. We raised objections and said this stuff is not within our personal knowledge and we object to it. It wasn't a slight of hand. It was we objected to the request. We did not feel like it called for the production of any information regarding Emmett Reeves. Thank you, Your Honor. I appreciate it. Mr. Myers, you're up for five. Hold on one second. May it please the court. Your Honor, it's Justin Myers here on behalf of Appellee Shawna Bradley. I know I'm moving out of time, but I'd just like to begin with just to clarify that Mrs. Bradley is a high-level employee. She was a run-of-the-mill accounts manager. In fact, she was so unimportant to PeopleSource that they couldn't even name her properly through three-minute pleading. I just wanted to clarify that, that we're not dealing with upper-level executive-type employee. She certainly was not an agent or mandatory on behalf of her employer. Again, she's just a mother trying to earn her living in the employment staffing industry, which she does have some experience in. On that point, I would, again, argue against any kind of claim that there's a fiduciary obligation or fiduciary duty imposed upon her and to rehash that argument just a little bit. Without that duty, she would have been under what the district court correctly recognized as sort of a lesser duty of allegiance, which does not arise to that level of fiduciary obligation. In fact, throughout the cases that we cite and brief, one of the common threads I'm seeing is basically one of the big limitations is you cannot act in antagonism, which is a much lower threshold I represent than fidelity, which dovetails into the unfair trade practices claim, which, again, is a pretty narrow band of law designed to get only really the most egregious-type conduct. Under that umbrella of unfair trade practices, we've cited in the brief, I believe, three to four cases that would allow, at least, it cites the law that would allow for an employee, even while before his resignation, to set up a competing business, even solicit business, specifically no soliciting business, and begin hiring employees. Under some of the facts of those cases, they may not have actually solicited the business, but each of those courts do cite that law. I would represent that anything cited to Mrs. . . . or charged to Mrs. Bradley in this matter would have been, at most, a preparation to compete falling outside of those very egregious, fraudulent-type activities that the unfair trade practices was designed to cover. Again, with Mrs. Bradley specifically, unlike the other defendants in this matter, there is another layer that we have to look at, and that would be the non-competition agreement. She was, in fact, under a non-competition agreement in this case, but we would submit to you if the district court correctly decided that that agreement should not apply, particularly its non-solicitation provisions, due to its being invalid under Louisiana law, which, as this court, I'm sure has heard many times, has got a very severe public policy against such type of agreements, which is specifically referenced in Statutes 23-921, particularly the preamble even states that all agreements that don't fall under its mechanical adherence to its categories are going to be null and void. We would submit that, on the cases we decided to brief, that these stringent-type limitations to non-competitions are also going to extend to any non-solicitation provisions. In the agreement that's in the record that Mrs. Bradley signed back in 2016, we would submit that it's going to be invalid under Louisiana law, due to its general over-breath in the definition of its business, particularly the fact that it tries to get any type of And then it even goes on, I think it's Section 5, subsection C, that says this agreement would even extend further to any other business that the company may become involved in throughout the future. And again, it's a mechanical adherence, but that's the way the Louisiana cases we would submit treat these things, and given this over-breath, I think we'd have to get rid of the non-competition agreement, including the non-solicitation privileges, which again would bring us right back to the meat of the coconut, so to speak, in that unfair trade practices claim, which seems to be where everything's lying as far as PeopleSource is pursuing. And again, to highlight on the trade secrets claim, again, there's no evidence that any trade secret was actually misappropriated in this case. I would submit that the February 4th email that PeopleSource relies upon to Mrs. Bradley shows nothing other than Mrs. Bradley received, along with other PeopleSource employees, a lot of those workers, I guess, work in, quote, shutdown work for the heavy industry in the area where they're from, and that was it. There's nothing more than—there's no connecting that dot to that Mrs. Bradley used that for any nefarious purposes. Even citing later, they like to cite that she may have made some omissions that are in the record. There's no connecting that she would have used that in antagonism or against her employer. So I would submit that the unfair trade practices as well—I mean, yes, the trade secrets claim should—dismissal should be affirmed as well. Your Honors, thank you for that. All right, Mr. Morris, thank you. I never heard me to the coconut before. That's a new one for me. Ms. Cancian, you've got five minutes on rebuttal. Were you able to find Judge Oldham's answer? Yes, I did, Judge. So there was an amended complaint filed in May of 2019 in which it was specifically pled that the only members of PeopleSource LLC were David Bozales and John Bozales, both of whom are domiciled in Oklahoma City, Oklahoma. Does that answer your question? Yes, it does. Okay, thank you. So I would like to address first my esteemed counsel's allegations about Shawna Bradley. Shawna Bradley did have a non-compete agreement and a non-solicitation provisions. That's not what we're suing under. She did not compete. I don't know if she did or not, but we have no evidence that she competed after she left. She's being sued because she engaged in an unfair trade practice while she was working for PeopleSource. And the testimony from Scott Albritton, which is in the record and was referenced in our opposition to the motion for summary judgment, is this. Did Shawna Bradley ever indicate that she had successfully moved PeopleSource clients over to WillSource before March 15, 2019? That's the date she resigned. Mr. Albritton responds, yes, she did. And which clients were those? Do you recall? Petrin Corporation specifically. I remember her telling me that after I found out that she knew as well, knew about the mass resignation, that she mentioned that. She also mentioned that Graphic Packaging, they had been in negotiations with getting their agreement signed already as well. So this is— Let me ask you just incidentally, you continue to refer to mass resignations. How many were in the mass? I believe there were nine. And the reason why we say that, Your Honor, that's referenced in another case as a mass resignation. I think it's the KBK financial case. But the reason why we say that is because it was all of our workers. The company has two locations in Ruston and in Monroe. And every single employee resigned on the exact same day using the exact same form letter. And, Your Honor, the reason why they all resigned is because the top vice president at those offices told them that PeopleSource is going to be driven out of business. Everybody's resigning, and you should too. And this is their boss talking to them. You should resign because we are also taking their customers and all the employees, and so they will have to close or sell the company for pennies on the dollar to WillSource, which by the way has the same name as PeopleSource. Before, the owners of WillSource had owned prior staffing companies. They had sold a staffing company to PeopleSource. Never before had they had the word source in their name of their companies. They adopted that name and also took their customers and their employees. So that's why we use the word mass resignation, because it was all of them. But in addition, my other esteemed counsel referenced the fact that, well, Innovative did involve solicitation of customers, and so it is analogous. And that's not at all what the evidence showed. The evidence did say, the court did note, that one of the employees had had lunch with a customer and had told them they were leaving. They never testified. There was no evidence admitted that they had actually solicited the customer to go with them. At some point, employees may tell a customer, I'm going to be resigning. That's not an unfair trade practice. That's not what we're saying they did. We're saying they took customers, and that is proven by their testimony that they successfully did that before they left. And if that is not an unfair trade practice, then I really don't know what is. And in fact, the courts have said that it is an unfair trade practice. That act of soliciting a customer while you're working is an unfair trade practice. And it almost doesn't matter if it is the highest officer, the account manager, a physical therapist, a low-level employee. In my opinion, and the cases support this, that all employees owe a duty of loyalty not to steal business. It's different to say you can prepare to compete. Yes, the courts say you can prepare to compete. You can register your business on the Secretary of State's website. You can hire a couple of employees. Where is the line drawn? The line is drawn when you start diverting the assets of your boss to your own for your own financial benefit. That's where the line is drawn. I think we have your argument on both sides. We appreciate it this morning. Thank you very much, Your Honor. The case is submitted, and we'll be in recess until tomorrow morning.